IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| MARK W. SAUNDERS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No.09-cv-1045-DGW |
| ) | |
| COMMISSIONER OF SOCIAL SECURITY, ) | |
| ) | |
| Defendant. ) | |
| ) | |
| ) | |

**MEMORANDUM AND ORDER**

**WILKERSON, Magistrate Judge:**

Mark W. Saunders ("Claimant") applied for disability insurance benefits and supplemental security income on December 20, 2005 (Tr. 45-51). Claimant alleged he became disabled on December 9, 2003, due to neck pain, shoulder pain, and anxiety attacks (Tr. 45; 54; 69). The Commissioner denied the claims initially on July 7, 2006 (Tr. 25), and upon reconsideration on October 11, 2005 (Tr. 33; 36). Claimant requested a hearing before an Administrative Law Judge ("ALJ") on December 4, 2006 (Tr. 41). At the hearing held on November 24, 2008, the Claimant amended his onset of disability date to November 1, 2004 (Tr. 8). In a decision dated March, 12, 2009, the ALJ found Claimant not disabled under the Social Security Act (Tr. 8-16). The Appeals Council denied Claimant's request for review on October 22, 2009 (Tr. 1). Thus, the decision of the ALJ became the final decision of the Commissioner. 20 C.F.R. § 416.1481. *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004). Claimant now seeks judicial review of the Agency's final decision pursuant to 42 U.S.C. § 405(g). As set forth below, the decision of the Commissioner is **REVERSED** and the case **REMANDED** to the Commissioner for further evaluation of the Claimant's application for disability insurance benefits and supplemental

security income in accordance with this opinion.

*Application for Benefits*

Claimant was born on May 6, 1966 (Tr. 63). He was thirty-eight years old on November 1, 2004, the date of his alleged onset of disability. Claimant alleged that he was unable to work due to neck and shoulder pain and anxiety attacks (Tr. 69). Since 1992, Claimant worked as a cashier, construction laborer, general laborer, and driver (Tr. 70-85). He was laid off from his most recent job because he was no longer able to lift or perform the physical requirements of the job (Tr. 69).

*Medical Records[1]*

An August 14, 1997, x-ray of the Claimant's lumbosacral spine showed "slight hypertrophic osteoarthritic spurring." There was no evidence of significant vertebral compression and the transverse processes and sacroiliac joints were normal (Tr. 166). The impression was osteoarthritis (Tr. 166). Claimant received a diagnosis of lumbar sprain (Tr. 167).

An August 29, 1997, MRI of Claimant's lumbar spine showed disk herniation at L4-5, moderate narrowing of neural foramina at L5-S1 without disk herniation, and scattered discovertebral degenerative changes (Tr. 200-201). Claimant had surgery on his lumbar spine in December 1997 (Tr. 159).

Claimant was involved in an automobile accident in April 1999. A May 26, 1999, MRI of Claimant's cervical spine revealed a herniated disk at C6-7 with encroachment of the spinal canal, which correlated with left C7 radiculopathy (Tr. 191).

On August 24, 1999, Claimant saw Dr. Robert E. Gardner of Neurological Associates of

---

[1] Because the Court ultimately resolves the case on the basis of the Claimant's physical impairments, the Court will not undertake a summary or review of the Claimant's mental impairments or his mental health treatment history.

Cape Girardeau for an evaluation. Dr. Gardner reported that after the April 1999 accident, Claimant had suffered from headaches and neck pain. After a neurological exam, Dr. Gardner determined that the Claimant's symptoms were "of musculoskeletal origin." He noted Claimant's self-report of past MRI with disk herniation and opined that a herniated disk could account for his pain. Dr. Gardner recommended CT, EEG, and EMG testing (Tr. 259-60).

A February 16, 2000, x-ray of the cervical spine showed "marked straightening of the normal cervical lordosis with restriction in range of motion in flexion and extension. The disk spaces were maintained and no fractures were seen. A CT scan of the cervical spine revealed disk herniation at C6-7, extending centrally and to the left, encroaching upon the neural foramina. There was associated bone spurring in the same region (Tr. 277).

A March 7, 2000, MRI of the cervical spine was normal, with normal disk spaces and no indication of disk herniation (Tr. 262).

An April 3, 2000, CT scan showed minimal bulging of the disk annulus at C5-6, eccentric bulging of disk annulus at C6-7 toward the left with early marginal osteophyte formation causing mild narrowing of the left lateral recess, but without evidence of nerve root or cord impingement (Tr. 263). A cervical myelogram performed the same day was normal (Tr. 265). A lumbar myelogram showed degenerative disk narrowing and vacuum disk phenomenon at L5-S1 with unilateral spondylolysis at L5 on the left side with degenerative sclerosis. There was no evidence of impingement on the existing S1 nerve roots. Mild bulging appeared at L4-5, causing minimal narrowing of the lateral recesses but no evidence of nerve root impingement. Early degenerative disk narrowing appeared at L3-4 with anterior marginal osteophyte formation (Tr. 266-67).

A May 1, 2000, MRI of Claimant's left shoulder showed subdeltoid and subacromial

bursitis, and tendonitis of the supraspinatus and infraspinatus tendons (Tr. 190).

A September 14, 2001, MRI of Claimant's lumbar spine showed narrowing of the intervertebral disk spaces and desiccated or degenerated disks at L1-2, L3-4, L4-5 and L5-S1, recurrent herniated disk at L4-5, and multilevel discogenic changes and hypertrophic osteoarthritic degenerative changes (Tr. 188).

A September 4, 2002, cervical CT scan revealed no disk herniation or vertebral canal or neural foraminal stenosis, but showed mild degenerative arthritic changes at C5, C6, and C7 (Tr. 276).

On March 26, 2003, claimant saw Dr. Stephen M. Brennan complaining of neck and upper shoulder pain. Dr. Brennan noted tenderness and muscle spasm in right and left trapezius muscles and in the right and left cervical paraspinous muscles. Dr. Brennan performed trigger point injections in those muscles. Dr. Brennan encouraged Claimant to continue with physical therapy and to return as needed (Tr. 237).

An MRI of the cervical spine performed on March 26, 2003, demonstrated disk herniation at C6-7 with possible nerve root impingement (Tr. 239). On December 9, 2003, Dr. Matthew Gornet performed microdiscectomy and anterior cervical fusion at C6-7 (Tr. 353-57).

Between August 2005 and September 2006, Claimant saw Dr. Saeed Khan at the Benton Medical Center twenty three times for chronic neck pain, chronic back pain, and headaches. In February 2006 Claimant also complained of numbness in his left leg (Tr. 324-25). On February 14, 2006, Dr. Khan recommended that Claimant see a neurologist (Tr. 324). During that period, Dr. Khan prescribed muscle relaxants Flexeril and Soma, the narcotic pain medication Vicodin, and the anti-anxiety medication Xanax (Tr. 320-28).

On March 30, 2006, Claimant was seen in the emergency room of the Franklin Hospital in Benton, Illinois, after an auto accident in which the car he was driving was hit from behind. He complained of back and neck pain. A CT scan of the head was normal. X-rays of the cervical spine showed no fracture or subluxation. X-rays of the lumbar spine showed no acute fracture but hypertropicspondylosis including disk narrowing and degenerative disk changes (Tr. 295-300).

On April 20, 2006, Claimant complained to Dr. Khan of increased neck pain and tingling and burning in both legs (Tr. 326). An April 25, 2006, MRI of the brain was normal (Tr. 316). An MRI of the cervical spine showed previous surgical fusion at C6-7 and minimal posterior diffuse disk bulge at C5-6 (Tr. 317). An MRI of the lumbar spine showed left paracentral disk herniation at L4-5 compressing the thecal sac and traversing the left nerve root, and degenerative changes with multi-level disk bulges T11-12 through L5-S1 with the combination of findings resulting in mild to moderate bilateral neural foraminal stenosis L3-4 and L4-5 and moderate bilateral neural foraminal stenosis at L5-S1 (Tr. 318-19).[2]

Nerve conduction studies performed on May 29, 2007, revealed decreased conduction velocity of the bilateral peroneal and tibial motor nerves, which is indicative of a motor neuropathy of the bilateral peroneal and tibial nerves (Tr. 372-74). Claimant subsequently received epidural steroid injections in the cervical spine on September 13 and October 11, 2007, and April 28 and June 9, 2008, at Southern Illinois Pain Management. Claimant reported as much as 50% pain relief following the procedures (Tr. 359-78).

Between September 6, 2006, and July 7, 2008, Claimant saw Dr. Khan approximately twelve times. He complained of headaches, and back, neck, and shoulder pain (Tr. 400-405).

---

[2] Foraminal Spinal Stenosis is "narrowing of the spinal column that causes pressure on the spinal cord, or narrowing of the openings (called neural foramina) where spinal nerves leave the spinal column." MedlinePlus, definition of Spinal Stenosis, http://www.nlm.nih.gov/medlineplus/ency/article/000441.htm (last visited September 26, 2011).

On November 19, 2008, Dr. Khan completed a medical source statement regarding Claimant's ability to perform work-related activities. Dr. Khan opined that Claimant could occasionally lift and carry up to 30 pounds. Dr. Khan reported that Claimant could sit for only one hour at a time, and could stand or walk for only 30 minutes at a time. He reported that in an eight-hour day Claimant could sit for four hours, stand for two hours, and walk for two hours. He opined that Claimant could occasionally reach, handle, finger, feel, and push or pull with both hands, and could operate foot controls occasionally. He determined that Claimant could never climb ladders or scaffolds and could only occasionally climb stairs and ramps, balance, stoop, kneel, crouch, or crawl. He determined that Claimant should never be exposed to unprotected heights or vibrations, and should only occasionally be exposed to moving mechanical parts, humidity and wetness, dust, odors, fumes, and pulmonary irritants, extreme cold, or extreme heat. Claimant could tolerate moderate noise. Finally, Dr. Khan reported that Claimant could shop, travel without a companion, ambulate without assistance, use public transportation, climb a few stairs at a reasonable pace, prepare a meal for himself, groom himself, and sort or handle paper or files (Tr. 410-15).

***Opinions of Non-Treating Physicians***

On June 19, 2006, Vittal V. Chapa examined Claimant for the Illinois Bureau of Disability Determination Services. Claimant complained of headaches and neck pain due to neck surgery. Upon examination, Dr. Chappa reported that Claimant had decreased motor strength in the left shoulder, decreased range of motion in the left shoulder, cervical spine, and lumbar spine, and decreased pinprick sensation in the lateral aspect of the left leg. Dr. Chappa diagnosed a history of headaches, status post lumbar disk surgery, and status post cervical spine surgery. Dr. Chappa

6

summarized:

> The claimant is a 40-year-old male. He complains of headaches due to neck surgery. He has the headaches about two or three times a week. They can last anywhere from one day to two weeks. He takes Vicodin for the headaches. He also has neck pain when he has the headaches. There is no history of migraine type of headaches. He has decreased strength at the left shoulder due to pain. Hand grip is 5/5 in both hands. He has decreased range of motion of the cervical spine and left shoulder. The claimant can perform both fine and gross manipulations with both hands. His gait is steady. He had no significant difficulty getting on the exam table and getting down from the exam table.

(Tr. 337.)

On July 6, 2006, non-examining, consulting physician C.A. Gotway completed a Physical Residual Functional Capacity Assessment. Dr. Gotway determined that Claimant was capable of occasionally lifting up to 20 pounds and frequently lifting up to 10 pounds. Dr. Gotway found that he was able to stand or walk 6 hours in an 8-hour workday, to sit about 6 hours in an 8-hour workday, and had an unlimited capacity for pushing and or pulling. Dr. Gotway determined that Claimant could only occasionally climb, balance, stoop, kneel, crouch, or crawl. He found that Claimant was limited in his ability to reach in all directions, but unlimited in his ability to handle, finger, or feel. Dr. Gotway found no visual, communicative, or environmental limitations (Tr. 342-49).

*ALJ Hearing*

Saunders appeared for a hearing before the ALJ on November 24, 2008. He was represented by an attorney. Ms. Barbara Minsic, a vocational expert, was also present (Tr. 417).

Saunders testified that he was forty-two years old. He completed the tenth grade. His most recent job was installing signs for a sign company. In that job, he was required to lift a maximum of 50 or 60 pounds. He stood for about half the day and sat for about half the day.

Prior to that job, Saunders worked as a gluer in a boat factory and as a driver. He worked various types of construction for a number of years, including siding, soffit, facia, interior work, exterior work, and roofing. He estimated that in those jobs he regularly lifted from 30 to 75 pounds (Tr. 420-22).

Saunders testified that he had neck surgery in 2003, and since that time he had been unable to work. He testified that he attempted to work as a driver for about three months in 2004, but he was unable to continue the job due to numbness and tingling in his arms and shoulders (Tr. 423-24). He stopped looking for work due to the pain in his back, neck, shoulders, arms, hands, legs, and feet (Tr. 424).

Saunders testified that at the time of the hearing he was experiencing pain in his lower back. He rated his pain at 8 on a scale from 0 (no pain) to 10 (excruciating pain). He testified that on a good day, his lower back pain level was approximately 6. On a bad day, his pain was a 9 or 10. He testified that he experienced the high level of pain three quarters of the days in a month (Tr. 433). He further testified that in his last job he missed up to two to three days of work per week due to lower back pain.

Saunders testified that he also experienced pain in his cervical spine. He rated his pain on the day of the hearing as 9 out of 10. He testified that he had surgery on his neck in 2003, and surgery on his lower back in 1997. He testified that in addition to his primary care physician, he received pain management treatments from a Dr. Jergens (Tr. 434-35).

Saunders testified that he experienced pain in his shoulders, arms, hands, and neck. The pain affected his ability to use his arms and hands, particularly on his left side. He experienced numbness and tingling in his hands and fingers, which sometimes caused him to drop things. The

8

pain also affected his ability to lift. He testified that he could not lift ten pounds frequently in an 8-hour work day (Tr. 435-36). Regarding the pain in his lower back, Saunders testified that the pain radiated to both of his legs, which limited his ability to stand. He testified that he could not stand for more than 30 or 45 minutes in an eight-hour work day (Tr. 436-37). He also had difficulty walking. He testified he could walk for only 10 to 15 minutes at a time, and a total of only 20 or 30 minutes in an eight-hour day (Tr. 437-38).

Barb Minsic, a vocational rehabilitation counselor, testified at the hearing. She testified that in the past 15 years, claimant worked as a sign installer, a route delivery driver, a construction laborer, and a gluer. Ms. Minsic testified that an individual with the functional limitations and work restrictions described by Claimant at the hearing would be unable to perform Claimant's past work or any other work because of his frequent absenteeism. The ALJ asked Ms. Minsic to consider an individual able to lift and carry 20 pounds occasionally and 10 pounds frequently; to stand or walk for six hours in an eight-hour day; to sit for six hours in an eight-hour day; to climb, balance, stoop, kneel, crouch, and crawl occasionally; to reach occasionally; and who had mild limitations understanding, remembering, and performing simple repetitive instructions; with slight problems interacting with supervisors, co-workers, and the general public; and with slight problems responding appropriately to stress in the workplace. Ms. Minsic testified that an individual with those restrictions would be unable to perform any of Claimant's past work, but would be able to perform the job of order clerk, a sedentary, unskilled job. She testified that 1,500 such jobs existed in the geographical area, and that 250,000 existed in the national economy. She testified that if such an individual was also markedly limited in the ability to carry out simple instructions and in understanding and remembering detailed instructions, there would be no jobs in

9

the economy he could perform (Tr. 441-44).

*ALJ's Opinion*

On March 12, 2009, the ALJ issued an opinion finding that the Claimant was not under a disability within the meaning of the Social Security Act from December 9, 2003, through the date of decision (Tr. 9). The ALJ determined that the Claimant had met the insured status requirements of the Social Security Act through September 30, 2009. At step one of the evaluation, the ALJ found that Saunders had not engaged in substantial gainful activity since November 1, 2004, the alleged date of onset of disability. At step two, the ALJ determined that Claimant had the severe impairments of degenerative disk disease of the cervical and lumbar spine, a depressive disorder, and generalized anxiety disorder (Tr. 9-10).

At step three, the ALJ determined that Saunders did not have an impairment or combination of impairments that met or medically equaled an impairment listed in the regulations. The ALJ found specifically that Saunders spinal disorder did not satisfy the criteria in section 1.04 for disorders of the spine, and Claimant's mental impairments did not satisfy the criteria of any listed mental impairment (Tr. 10-11).

At step four, the ALJ found that Saunders had the Residual Functional Capacity ("RFC") to perform light work with only occasional climbing, balancing, stooping, kneeling, crouching, or crawling, and no work involving more than simple repetitive tasks. The ALJ cited evidence in numerous MRI, CT scans, and x-rays that demonstrated "varying degrees of multi-level degenerative disk disease as well as recurrent disk herniations at C6-7 and L4-5." The ALJ noted the diagnoses of bursitis and tendinitis in Claimant's left shoulder, the 2003 trigger-point injections for neck and shoulder pain, 2006 emergency room visit for neck and back pain, x-rays of

the cervical spine indicating post-surgical changes, and x-rays of the lumbar spine indicating hypertrophic spondylosis with disk narrowing and degenerative disk changes. The ALJ also noted Claimant's regular medical appointments with Dr. Khan between September 2006 and July 2008 for neck and back pain. Finally, the ALJ noted the evaluation by the non-treating, evaluating physician Dr. Chappa, which indicated decreased strength in the left shoulder and decreased range of motion in the cervical spine and left shoulder (Tr. 12).

Based on this medical information, the ALJ found that the Claimant's medically determinable impairments could reasonably have caused some of his alleged symptoms. The ALJ also found, however, that the Claimant's statements concerning intensity, persistence, and limiting effects of his symptoms were not credible "to the extent they are inconsistent with the above residual functional capacity assessment." Specifically, the ALJ determined that the medical evidence did not support the severe physical restrictions alleged by the Claimant. The ALJ discredited the work limitations described by Dr. Khan, Claimant's treating physician, because his opinion was not supported by medical or clinical findings. Furthermore, the ALJ found that Dr. Khan's treatment notes also did not support the restrictions because they showed only routine care on an occasional basis which did not begin until two years after Claimant's alleged onset of disability date. Based on these perceived contradictions between Dr. Khan's opinions and his treatment notes, his failure to support his opinions with clinical findings, and his admissions that Saunders could shop, walk without assistance, use public transportation, climb a few steps, prepare a simple meal, care for his own personal hygiene, and sort and use paper files, the ALJ rejected Dr. Khan's opinion and adopted the opinion of the state agency's consultant that Claimant could perform light work with only some postural and reaching limitations (Tr. 14).

Based on the ALJ's determination of the RFC (described above), the ALJ found that Claimant was not capable of performing any of his past relevant work (Tr. 15).

At step five, the ALJ found that because Claimant was not able to perform the full range of light work, he could not rely solely on the guidelines. He therefore deferred to the vocational expert's testimony that based on his ability to perform light work with some restrictions, Claimant could perform the job of order clerk, a sedentary unskilled job, of which there were 1,500 jobs locally and 250,000 nationally. Thus, the ALJ found that Claimant was capable of performing work that existed in significant numbers in the national economy. Thus, the ALJ found that claimant was not disabled and had not been under a disability from December 9, 2003, to the date of the decision, March 12, 2009 (Tr. 15-16).

## CONCLUSIONS OF LAW

### *Standard of Review*

To receive disability benefits, a claimant must be "disabled." A disabled person is one whose physical or mental impairments result from anatomical, physiological, or psychological abnormalities which can be demonstrated by medically acceptable clinical and laboratory diagnostic techniques and which prevent the person from performing previous work and any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(1)(A), 423(d)(2)(A), 1382c(a)(3)(B), 1382c(a)(3)(D).

The Social Security regulations provide for a five-step sequential inquiry for determining whether a claimant is disabled. 20 C.F.R. §§ 404.1520, 416.920. The Commissioner must consider in sequence: (1) whether the claimant is currently employed and doing substantial gainful activity, (2) whether the claimant has a severe medically determinable physical or mental

impairment or combination of impairments, (3) whether the impairment meets or equals one listed by the Commissioner and whether it meets the duration requirement, (4) whether the claimant has the residual functional capacity to return to doing his or her past work, and (5) whether the claimant is capable of making an adjustment to some other type of work available in the national economy. *Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003); *Clifford v. Apfel*, 227 F. 3d 863, 868 (7th Cir. 2000). If the claimant does not have a listed impairment but cannot perform his or her past work, then the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. *Id.*

Under the Social Security Act, a court must sustain the Commissioner's findings if they are supported by substantial evidence and are "free of legal error." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002); 42 U.S.C. § 405(g). Substantial evidence is "more than a mere scintilla" of proof. The standard is satisfied by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Campbell v. Astrue,* 627 F.3d 299, 306 (7th Cir. 2010) (citations omitted). An ALJ need not address every objective finding in the record for his judgment to be supported by substantial evidence. The ALJ "need only build a bridge from the evidence to his conclusion." *Sims v. Barnhart,* 309 F.3d 424, 429 (7th Cir. 2002) (quoting *Green v. Apfel*, 204 F.3d 780, 781 (7th Cir. 2000)). The Seventh Circuit urges "a commonsensical reading" of a claimant's medical history, "rather than nitpicking at it." *Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir. 1999).

In this appeal, the Claimant argues that the ALJ erred 1) in not finding Claimant disabled based upon the listings; 2) in rejecting the opinion of Claimant's treating physician; and 3) in rejecting the findings of Claimant's mental health providers.

*Meeting or Equaling a Listing*

A theory of "presumptive disability" is employed in Social Security disability cases, which means that a claimant is eligible for benefits if he or she has a condition that "meets or equals" an impairment designated by the Commissioner. The listing of impairments, found at 20 C.F.R. Pt. 404, Subpt. P, App. 1, includes specific criteria for each designated impairment. If a claimant meets the criteria for a given impairment, the agency presumes he or she is disabled. *See* 20 C.F.R. § 1520; *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004). A claimant may also show disability presumptively by demonstrating that his or her symptoms are equal in severity to those described in a listing. *Id.;* 20 C.F.R. § 404.1526. The Seventh Circuit holds that in determining whether a claimant meets or equals a listing, an ALJ must do more than name the listing and give merely a "perfunctory analysis" of it. *Barnett,* 381 F.3d at 668. An ALJ should evaluate the evidence in light of a listing's criteria, including evidence favorable to the claimant. *See Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006). *See also Barnett,* 381 F.3d at 670 (finding ALJ's two-sentence discussion of listing inadequate and warranting remand); *Brindisi ex rel. Brindisi v. Barnhart,* 315 F.3d 783, 786 (7th Cir. 2003) (finding ALJ's failure to discuss claimant's impairments "in conjunction" with listing "frustrates any attempt at judicial review"); *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002) (finding ALJ's failure to discuss evidence in light of listing's "analytical framework" leaves court "with grave reservations as to whether his factual assessment addressed adequately the criteria of the listing"); *Steele*, 290 F.3d at 940 (finding erroneous ALJ's failure to discuss or cite listing at step three).

As relevant here, the listing 1.04A, for disorders of the spine, requires evidence of the compromise of a nerve root or the spinal cord with nerve root compression "characterized by

neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)." 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 1.04A.

At the point in his opinion where he determined Claimant's impairments did not meet or equal a listing, the ALJ did not meaningfully discuss the Claimant's medical records. The ALJ merely stated, "the claimant's spinal disorder does not satisfy the criteria in section 1.04 (disorder of the spine resulting in compromise of a nerve root or the spinal cord, with either evidence of nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis resulting in pseudoclaudication)" (Tr. 10-11). The ALJ did not discuss any of the objective medical evidence regarding the criteria in the listing.

A failure to discuss evidence may not require reversal so long as the ALJ builds a "logical bridge" from evidence to conclusion. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). But the Court's review of the record reveals evidence that Saunders potentially meets the criteria in listing 1.04A. Regarding compromise of the nerve root, an April 25, 2006, MRI of the lumbar spine showed left paracentral disk herniation at L4-5 compressing the thecal sac and traversing the left nerve root, and degenerative changes with multi-level disk bulges T11-12 through L5-S1 with the combination of findings resulting in mild to moderate bilateral neural foraminal stenosis L3-4 and L4-5 and moderate bilateral neural foraminal stenosis at L5-S1 (Tr. 318-19). Regarding range-of-motion and sensory loss, the agency physician, Dr. Chappa, found decreased range-of-motion in the left shoulder and cervical and lumbar spine, and decreased pinprick sensation in the lateral aspect of the left leg. Dr. Chappa also noted muscle weakness, which

15

could be evidence of motor loss.  Finally, regarding the neuro-anatomic distribution of pain, the Claimant continually complained to physicians of pain in his neck and back, causing residual headaches and numbness and tingling in his extremities.

The ALJ did not discuss any of this evidence in finding, at step three, that the Claimant's impairments did not meet or equal listing 1.04A.  The Court notes that the ALJ did discuss objective medical findings at step four of the five-step analysis, when determining the Claimant's credibility.  Even in that discussion, however, the ALJ did not address all of the criteria in listing 1.04A.  He reported only Claimant's degenerative disk disease and recurrent disk herniations.  The ALJ did not discuss Dr. Chappa's findings regarding decreased range of motion of the lumbar spine or the loss of sensation in the left leg, nor did he discuss whether any medical record addressed motor loss or muscle weakness.  Failing to discuss these criteria in any meaningful way is error under the Seventh Circuit's standards.  As noted above, an ALJ's error of law warrants reversal.  Accordingly, the Court will remand the case to the Commissioner for re-evaluation at step three of the five-step process.  The ALJ shall thoroughly consider whether Claimant's impairments meet or equal listing 1.04A.[3]

## CONCLUSION

Based on all the foregoing, the case is **REVERSED and REMANDED** to the Commissioner for further evaluation of Claimant's application for disability insurance benefits and supplemental security income in accordance with this opinion. *See* 42 U.S.C. § 405(g).   The ALJ is **DIRECTED** to reconsider whether Claimant, Mark W. Saunders, is presumptively

---

[3] Because the Court is remanding the case to the Commissioner for re-evaluation at step three of the five-step analysis, the Court will not address whether the ALJ erred in discrediting the opinion of Claimant's treating physician or erred in discrediting the opinion of Claimant's mental health provider.   If, upon remand, the ALJ does not award benefits to Claimant at step three, he shall re-perform the analysis at steps four and five.

disabled at step three of the five-step process.

**IT IS SO ORDERED.**

**DATED: September 26, 2011**

　　　　　　　　　　　　　　　　　　　　　　　**DONALD G. WILKERSON**
　　　　　　　　　　　　　　　　　　　　　　　**United States Magistrate Judge**